**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

Steven Koth
Dustin Korcharski

On behalf of Themselves and
all others similarly situated

Case No: _____

        Plaintiffs,

v.

Neenah, Inc.

        Defendant.

## COMPLAINT

Named Plaintiffs, by their attorneys, for their Complaint against Defendant state as follows:

1.    This is an individual and collective action under the Fair Labor Standards Act, and an individual and class action under Wisconsin law by Plaintiffs, on behalf of themselves and other current and former hourly non-exempt employees of Neenah Inc. ("Neenah") who worked at the Whiting Mill located at Stevens Point, Wisconsin, to seek redress for Neenah's failure to pay them straight time and overtime wages required by law.

### JURISDICTION AND VENUE

2.    This court has subject matter jurisdiction under 29 USC §216(b) and 28 U.S.C. §1331 because Plaintiffs allege violations of the Fair Labor Standards Act, 29 U.S.C. §201 et seq.

3.    This Court has supplemental jurisdiction over the Plaintiffs' claims brought under Wisconsin law pursuant to 28 U.S.C. §1367 because in each instance the corresponding FLSA and Wisconsin law claims advanced by this Complaint are based on the same set of operative facts, so that the FLSA and Wisconsin law claims together form the same case or controversy.

1

4.     This Court has personal jurisdiction over Neenah because it is a foreign corporation that purposefully conducts operations in Wisconsin by operating the Whiting Mill, and because all of Plaintiffs' claims arise from Neenah's operation of the Whiting Mill in Wisconsin.

5.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because all events that gave rise to the claims described by this Complaint occurred within this district.

## THE PARTIES

6.     Named Plaintiffs are adult residents of the State of Wisconsin. Named Plaintiffs are current employees of Neenah who work at its facility located in Stevens Point, Wisconsin as shift workers. The Named Plaintiffs' opt-in consent forms are filed with the Court at the same time that this Complaint is filed with the Court.

7.     Defendant Neenah is registered with the Wisconsin Department of Financial Institutions as a foreign corporation. Neenah operates multiple paper mills in Wisconsin including the Whiting Mill where the Named Plaintiffs work.

8.     In 2022, Neenah merged with Schweitzer-Mauduit International to form Mativ Holdings, Inc. Following the merger, a previous version of Neenah Inc. revoked its certificate/registration with the Wisconsin Department of Financial Institutions. A new Neenah Inc. was registered with the Wisconsin Department of Financial Institutions on April 25, 2023, and has filed annual reports with the Department ever since. Mativ Holdings is not registered with the Wisconsin Department of Financial Institutions as a domestic or foreign corporate entity. Based on all these pled facts, and upon information and belief, Neenah is the corporate entity operating the Whiting Mill, so that it rather than Mativ Holdings, Inc. is the correct defendant for this lawsuit.

2

9. Neenah by virtue of its engagement in business that employs one or more persons within Wisconsin is an employer within the meaning of Wis. Stat. §109.01(3). Neenah as a for-profit entity is also a mercantile establishment within the meaning of DWD §274.01(5). Neenah is also an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. §203, by, for example, purchasing equipment, materials and supplies from outside Wisconsin, and by advertising and selling its products through the channels of interstate commerce, and throughout the United States and beyond. At all relevant times, Neenah has generated annual gross volume of business at or above $500,000 both overall, and through its operations at its Stevens Point, Wisconsin facility.

## FACTS

10. At the Whiting Mill, Neenah employs employees who are classified as shift workers, and employees who are classified as dayworkers.

11. To allow Neenah to maintain 24-hour operation at the Whiting Mill, Shift workers are regularly scheduled to work from 7:00 a.m. to 3:00 p.m., from 3:00 p.m. to 11:00 p.m., or from 11:00 p.m. to 7:00 a.m. Due to operational requirements, shift workers may also be asked to work shifts that are longer than 8 hours.

12. At the Whiting Mill, both shift workers and day workers must punch in at the beginning of their shifts.

13. Once a shift worker punches in, he would immediately walk to his work area to relieve his partner who performed the same job during the immediately preceding shift.

14. Neenah does not allow shift workers to leave their work area until their partner for the next shift arrives in the production area, the handover meeting required by Neenah is held with the partner, and the partner is ready to take over the shift worker's work. Whiting Mill shift

3

workers would begin handover meetings with their partners from the previous shift as soon as they arrived at their work areas.

15.  Frequently, handover meetings would occur while the departing shift worker is in the middle of producing products to fulfill an order. The machines that produce products to fulfill orders cannot be programmed in advance to automatically stop production as soon as the quantity of products needed to fulfill the order is produced. As a result, during the handover meeting a shift worker must tell his relieving partner how much product needed to fulfill an order has already been produced, so that the relieving partner knows how much additional product must be produced to fulfill the order; and therefore when the stop the machine so that the client is not shortchanged, and no products that are not needed are produced.

16.  During the handover meeting the shift worker who worked the previous shift would also communicate to his partner vital information that the partner needs to take over and perform the work safely and effectively, including for example the operational status of each piece of equipment, whether any supplies have run out, whether he is carrying out any work-arounds to address problems with equipment or supplies, and whether there are any safety hazards or other difficulties to watch out for while performing work.

17.  At all times between the beginning of 2023 and the present, Neenah has always rounded all punch-in times for all Whiting Mill employees to the nearest quarter hour. As a result, employees begin to be paid at the top of the hour if they punch in 7 minutes or less before the top of the hour.

18.  Neenah requires Whiting Mill shift workers to punch in at or before the scheduled start times for their shifts. As a result, there are very few instances in which shift workers would begin to perform work by participating in handover meetings after the scheduled start times of

4

their shifts. There are far more instances in which shift workers began to participate in handover meetings before the scheduled start times for their shifts, but would not begin to receive pay until the scheduled start times for their shifts.

19.    At the beginning of 2023, Neenah announced to its Whiting Mill shift workers that they must punch-in within 15 minutes of the scheduled start times for their shifts. In 2023, Whiting Mill shift workers would sometimes punch in between 8 and 14 minutes before the scheduled start times of their shifts and begin to receive pay 15 minutes before the scheduled start times of their shifts, so that Neenah's rounding of punch-in times resulted sometimes in shift workers receiving pay for minutes not worked, to offset the frequent instances when the same shift workers did not receive pay for minutes worked because they began to participate in handover meetings before the scheduled start times for their shifts but did not begin to receive pay until the scheduled start times for their shifts.

20.    On December 14, 2023, Neenah announced to its Whiting Mill shift workers that effective January 1, 2024, they are not allowed to punch in more than 7 minutes before the scheduled start times for their shifts. Neenah has strictly enforced this rule since January 1, 2024.

21.    Neenah's requirement that its Whiting Mill shift workers must punch in between 0 and 7 minutes before their scheduled start times did not change the shift workers' practice of holding handover meetings with their partners before the top of the hour. Shift workers would indeed line up and wait at time clocks so that they can punch in 7 minutes before the scheduled start times for their shifts; and would then immediately walk to their work areas to hold handover meetings with the partners that they are relieving.

22.    By requiring shift workers to punch in between 0 and 7 minutes before the scheduled start times of their shifts, and because employees are not allowed to punch in after the

5

scheduled start times for their shifts, Neenah has virtually eliminated instances in which punch-in times would be rounded in the employee's favor, and result in Whiting Mill shift workers receiving pay for minutes not worked. As a result, there are very few if any overpayments to offset the many instances when Whiting Mill shift workers are not paid for minutes worked because they hold handover meetings with their partners before the scheduled start times for their shifts, but do not begin to receive pay until the scheduled start times for their shifts.

23. Neenah maintains records that show its Whiting Mill shift workers would frequently punch in 7 minutes before the scheduled start times for their shifts; and knew through its supervisors on the shop floor that its Whiting Mill shift workers would frequently hold handover meetings with their partners before the scheduled start times for their shifts. Neenah has never either promulgated or enforced a rule that prevents its Whiting Mill shift workers from performing unpaid work by prohibiting them from holding handover meetings with their partners before the scheduled start times of their shifts.

24. Neenah pays to one or more Plaintiffs along with other Whiting Mill employees two additional hours of pay for performing the work of changing paper machine wires, to provide them with additional compensation for work that involves handling heavy wires around tight spaces with dangerous pinch points, slip hazards, and complex moving parts; thereby creating hazards including lock out tag out failures, pinch points, risks of injury caused by heavy lifting, and potentially life threatening slips and falls into machinery. The additional pay for changing paper machine wires is listed on employee check stubs as Wire Time Pay.

25. For each hour worked over 40 per week, aside from Sunday and holiday overtime, Neenah pays to its Whiting Mill employees overtime premium pay equal to ½ of the computed weekly regular rate.

26. Neenah does not include Wire Time Pay in computing its Whiting Mill employees' regular rate of pay, which is then used to compute their overtime premium pay.

27. Neenah pays its Whiting Mill employees two additional hours of pay if they receive less than 24 hours advanced notice to start work at a time other than their normal start time. The additional pay is listed on employee check stubs as Call Time Pay.

28. Call Time Pay compensates employees for the inconvenience of working a shift with an irregular start time with little advanced notice to allow the employees to plan to avoid disruptions to their lives; rather than for abbreviated rest periods between shifts. For example, Whiting Mill employees do not receive Call Time Pay if they work, as scheduled, from 3:00 p.m. to 11:00 p.m. on day one and from 7:00 a.m. to 3:00 p.m. on day two; but do receive Call Time Pay if on the same day they both work from 7:00 a.m. to 3:00 p.m., and are given less than 24 hours' notice to return to the plant at 11:00 p.m. to perform additional work, even though in both instances they received 8 hours rest between shifts.

29. Neenah does not include Call Time pay in computing its Whiting Mill employees' regular rates of pay, which are then used to compute the amount of overtime premium pay that they should receive for their hours worked over 40 per week.

30. At or near the beginning of both 2023 and 2024, Neenah both sent to all of its Whiting Mill employees by email, and posted at the Whiting Mill, notice of the employees' eligibility to receive payments through a Short Term Incentive Plan ("STIP"). The announcement announced a target percentage for the STIP payment; identified criteria such as EBITDA, top line revenue, and safety performance that would be evaluated to compute the final percentage for the STIP payment; and provided links to both the Short-Term Incentive Pay Plan Document and to a video that provides more information on how the final STIP payout percentage is computed.

31.     The same announcements that announced the STIP for 2023 and 2024 also explained to Whiting Mill employees that to be eligible to receive STIP payments, they must both remain active MATIV employees at the time the STIP payments are made and must complete three safety activities per quarter.  Safety activities include attending monthly safety meetings, reporting safety issues to management, and completing safety training.  Neenah sent monthly emails to each Whiting Mill employee to track the number of safety activities that they completed.

32.     Once the STIP payment percentage is determined, Neenah computed the amount of the STIP payment for its Whiting Mill employees by multiplying the determined payment percentage by all compensation received by the employee during a time period of just under one year, with the exception of the previous year's STIP payment and a $225 safety shoe reimbursement payment.  Neenah therefore paid to its employees STIP payments measured as a percentage of pay that it excluded from the computation of the regular rate, such as vacation pay and holiday pay.

33.     While Neenah measured performance during the calendar year to determine the final payment percentage for the STIP payment, wages that are used to compute the amount of the STIP payment are not necessarily earned during the matching calendar year.  For example, even though the performance period that Neenah used to compute the 2024 STIP payment percentage was January 1, 2024 through December 31, 2024, pay that was used to compute the amount of the STIP payments was earned by Whiting Mill employees between December 18, 2023 and December 15, 2024.  Similarly, even though the performance period that Neenah used to compute the 2023 STIP payment percentage was January 1, 2023 through December 31, 2023, pay that was used to compute the amount of the STIP payments was earned by Whiting Mill employees between December 26, 2022 and December 17, 2023.

34.     Neenah did not pay to the Named Plaintiffs or any other Whiting Mill employees overtime premium pay on the STIP payments that they received.

35.     All Named Plaintiffs are shift workers who frequently worked more than 40 hours per week during the time period between January 1, 2024 to the present, so that they would have received more overtime pay had Neenah recognized the time when they began their handover meetings with their partner from the previous shift rather than their scheduled start times as the time when their compensable workdays began.

36.     During the past three years, one or more Named Plaintiffs received Wire Time Pay and Call Time Pay during workweeks in which they worked more than 40 hours. Named Plaintiffs also both received the STIP payments for 2023 and/or 2024, and worked more than 40 hours per week during some weeks in the corresponding calendar year(s). Named Plaintiffs therefore would have received more overtime pay had Neenah included Wire Time Pay or Call Time Pay in computing their regular rates or paid overtime premium pay on the STIP payments.

## COLLECTIVE ACTION ALLEGATIONS

37.     Plaintiffs seek to bring a collective claim, on behalf of all shift workers who worked at the Whiting Mill, that challenge Neenah's uniform policies that required shift workers to punch in between 0 and 7 minutes before the scheduled start times of their shifts, and then rounded all of their punch-in times to the scheduled start times of their shifts, which combined to cause, during the period of January 1, 2024 to the present, its failure to fully compensate Whiting Mill shift workers for all of their overtime hours worked.

38.     Plaintiffs also seek to bring a collective claim, on behalf of all hourly non-exempt shift workers and day workers who worked at the Whiting Mill, that challenge Neenah's uniform policies of excluding Wire Time Pay from the regular rate computation, excluding Call

9

Time Pay from the regular rate computation, and not paying additional overtime pay to its employees on the STIP payments that they received.

39.     Named Plaintiffs are similarly situated to other members of the proposed collectives because they are shift workers who frequently began change-over meetings before the scheduled start times of their shifts yet were not paid until the scheduled start times of their shifts during workweeks in which they worked more than 40 hours; received Wire Time pay and Call Time pay during workweeks in which they worked more than 40 hours; and received the STIP payments for 2023 and 2024, worked more than 40 hours during some weeks during the calendar years, yet did not receive additional overtime premium pay on the STIP payments that they received.

## CLASS ALLEGATIONS

40.     Plaintiffs seek to represent the following classes pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All Shift workers employed by Neenah at the Whiting Mill on or after May 28, 2024;

> All hourly non-exempt employees employed by Neenah at the Whiting Mill who during the time period between May 28, 2024 to the present received Wire Time Pay;

> All hourly non-exempt employees employed by Neenah at the Whiting Mill who during the time period between May 28, 2024 to the present received Call Time Pay; and

> All hourly non-exempt employees employed by Neenah at the Whiting Mill who received a STIP payment pursuant to the MATIV 2024 Short Term Incentive Plan.

41.     Persons in each of the subclasses identified above are so numerous that joinder of all members is impracticable. Neenah has employed hundreds of shift workers at its Whiting Mill since January 1, 2024; and made STIP payments to hundreds of Whiting Mill employees pursuant

10

to the MATIV 2024 Short Term Incentive Plan.  Upon information and belief, during the time period between May 26, 2024 and the present Neenah has paid Call Time Pay to hundreds of Whiting Mill employees; and has paid Wire Time Pay to at least 40 Whiting Mill employees.

42.    Commonality is satisfied because the Court can decide Neenah's liability to class members by answering common questions including (a) Whether Wisconsin law permits employers to round employee time clock punches; (b) Whether Neenah's policy of rounding all punch-in times to the nearest quarter hour is not neutral as applied, because it required its Whiting Mill shift workers to punch in between 0 and 7 minutes before the scheduled start times for their shifts; (c) whether an additional payment to employees to compensate them for the hazards or difficulties of work such as Wire Time pay must be included in the Wisconsin regular rate; (d) whether an additional payment to the employee to compensate them for the inconvenience of working a shift with an irregular start time without 24 hours advanced notice must be included in the regular rate; (e) whether the STIP payments are non-discretionary bonuses that must be included in the regular rate; (f) whether the STIP payments are bona fide percentage bonuses though the time period for which the STIP payments are paid do not match the time period during which the STIP payments were earned, and though the STIP payments increase the employees' weekly regular rate by a higher percentage than it increases the employees' receipt of overtime pay; and (g) whether, to the extent class members recover any overtime damages for 2024, they are entitled to additional overtime pay on the overtime damages to account for the effect of the STIP payments to increasing their regular rate of pay during the 2024 workweeks for which they are recovering overtime damages.

43.    Named Plaintiffs' claims are typical of other class members because they are shift workers who were not paid for compensable worktime that began when they began their

11

handover meeting and before the scheduled start times for their shifts; because one or more of them received Wire Time Pay that was not included in computing their regular rate of pay, because one or more of them received Call Time Pay that was not included in computing their regular rate of pay, and because they did not receive additional overtime pay on the STIP payments that they earned pursuant to the MATIV 2024 Short Term Incentive Plan.

44.     Plaintiffs will fairly and adequately protect the interests of the Rule 23 class because they have been victimized by each uniform policy at issue in this case, they have a financial incentive to obtain answers favorable to employees on each common question listed in Paragraph 42 of the Complaint, their prosecution of this lawsuit will not harm the concrete interests of any other class members, their claims are not subject to any unique defenses when compared to the claims of other class members, and they have retained counsel experienced in representing employees, including unionized employees, in complex wage and hour litigation.

45.     Common questions of liability outlined in Paragraph 42 of the Complaint will predominate over questions of damages because the Court can use class members' punch-in times to estimate when shift workers began to perform work by attending handover meetings.  Once the Court has filled the gap in Neenah's recordkeeping, it can apply uniform formulas to Neenah's own records to compute damages for each class member without conducting any individualized proceedings on damages.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this case. Neenah's common and uniform policies and practices denied members of each proposed subclass the full amount of overtime wages to which they are entitled. The damages suffered by the individual Wisconsin Unpaid Wage Class members are likely in the hundreds or at most a few thousand dollars per year and are too small to generate a contingency

12

fee that could justify retained counsel bearing the risks of contingency fee litigation, so that the alternative to class wide litigation is no litigation at all, resulting in class members recovering none of the overtime wages that they are owed. Proceeding as a class action will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the legality of Neenah's overtime computation policies.

## COUNT I. CLAIM FOR OVERTIME PAY UNDER THE FLSA.

47.     Plaintiffs re-allege, and incorporate by reference, the allegations contained in paragraphs 1- 46 of the Complaint.

48.     Facially neutral rounding of starting times is only lawful if the rounding will not, over a period of time, result in the employer failing to compensate its employees properly for all the time they have worked.

49.     Whiting Mill shift workers' time spent attending handover meetings is integral and indispensable to their subsequent performance of work for Neenah both because they need to know the status of equipment and materials so that they can work safely and effectively, and because they need to know the status of orders that are being processed at the time of the change-over so that they can determine how much additional product to produce without either short-changing the customer or producing waste. As a result, each shift worker's compensable workday began when he began the handover meeting with his partner from the previous shift.

50.     During the time period between January 1, 2024 to the present, Whiting Mill Shift workers would frequently punch in 5-7 minutes before their scheduled start times, and then immediately walk over to their work areas to begin handover meetings with their partners. Whiting Mill Shift Workers therefore frequently began handover meetings, so that their compensable workdays began, 3-6 minutes before their scheduled start times.

13

51.     By requiring its Whiting Mill shift workers to punch in between 0 and 7 minutes before the scheduled start times of their shifts and rounding all punch-in times to the nearest quarter hour, Neenah virtually eliminated instances in which shift workers received credit for minutes not worked, to offset the frequent instances in which Neenah disregarded the 3-6 minutes that they worked per day before the scheduled start times of their shifts.

52.     Neenah's policy of requiring its Whiting Mill shift workers to punch in between 0 and 7 minutes before the scheduled start times of their shifts, when implemented in tandem with its policy of rounding all punch-in times to the nearest quarter hour, therefore resulted in Neenah's failure to compensate Whiting Mill shift workers for all of their overtime hours worked during the time period of January 1, 2024 to the present. Whiting Mill shift workers are entitled to recover all additional overtime pay they would have received, had Neenah recognized the times when they began the handover meetings rather than the scheduled start times of their shifts as the times when their compensable workdays began.

53.     Wire Time Pay compensates employees for the hazards and physical demands associated with performing the work of changing paper machine wires and therefore is a premium for hazardous and arduous work that constitutes remuneration for employment.

54.     Because Wire Time Pay does not fall within any of the exceptions recognized by Section 207(e) of the FLSA, it must be included in computing the employee's regular rate of pay for the workweek during which the Wire Time Pay was earned.

55.     Neenah therefore violated the FLSA when it failed to include Wire Time Pay that it paid to Whiting Mill employees in computing their weekly regular rates of pay.

56.     Call Time Pay compensates employees for the inconvenience and disruption to their private lives caused by having to work shifts with irregular start times, with less than 24

14

hours advanced notice so that they cannot effectively adjust their schedules and sleeping patterns to minimize the impact that the irregular schedule has to disarrange their lives.

57.    Because the availability of Call Time Pay is tied to working schedules with an irregular start time with little advanced notice, and does not depend on whether the employee had an abbreviated rest period between shifts, the availability of Call Time Pay is tied to when work is performed.  Call Time Pay therefore is additional remuneration for employment rather than other similar payments that are not paid as compensation for hours of employment within the meaning of Section 207(g)(2) of the FLSA.

58.    Because Call Time Pay is additional pay for working an inconvenient work schedule, it is not pay for occasional periods when no work is performed.  Call Time Pay also is not either reimbursement of expenses or any other form of payment that falls within one of the exceptions recognized by §207(e) of the FLSA.  Call Time Pay therefore is remuneration for employment that must be included in the FLSA regular rate.

59.    Neenah therefore violated the FLSA when it failed to include Call Time Pay that it paid to Whiting Mill employees in computing their weekly regular rates of pay.

60.    By announcing at the beginning of 2023 and 2024 that Whiting Mill employees were eligible for STIP payments computed as a percentage of their annual earnings, the target payout percentage, along with criteria that would be evaluated to determine the final payout percentage, Neenah surrendered in advance its discretion as to both the fact of payment and amount of the STIP payments, so that the STIP payments are non-discretionary bonuses that must be included in the FLSA regular rate of pay.

61.    By announcing in advance that eligibility for STIP payments depended on Whiting Mill employee both remaining MATIV employees at the time the payments are made

15

and completing three safety activities per quarter, and by sending monthly emails to Whiting Mill employees to remind them of the number of safety activities they have completed, Neenah announced the STIP payments to its employees in advance to induce them to both participate in safety activities and thereby improve safety in the plant and to remain with the firm, so that the STIP payments are promised bonuses tied to continuance of employment and safety that must be included in computing the employees' regular rates of pay.

62. Because the STIP payments are non-discretionary bonuses that must be included in the regular rate, once the STIP payments were paid to Whiting Mill employees, to compute their overtime impact the STIP payments must be apportioned back over the performance periods during which they were earned.

63. Neenah paid the STIP payments for a different time period than the calendar years during which they were earned.

64. Employees were only entitled to receive STIP payments as a percentage of compensation excluded from the regular rate (such as vacation or holiday pay) if they remained employed at Whiting Mill at the time the STIP payments were made, and if they completed the required safety activities to become eligible for STIP payments. STIP payments computed as a percentage of compensation excluded from the regular rate therefore are non-discretionary bonuses that were promised in advance and therefore must be included in the regular rate, rather than additional compensation that may be excluded from the regular rate.

65. Because STIP payments computed as a percentage of vacation and holiday pay must be included in the regular rate, the STIP payments increased the receiving employees' regular rate of pay by a greater percentage than they increased the receiving employees' overtime pay received.

16

66.     Because the STIP payments did not increase the receiving employees' regular rates of pay and overtime pay by the same percentage for the exact time periods during which the STIP payments were earned, the STIP payments are not true percentage bonuses that qualify for the safe harbor offered by 29 C.F.R. §778.210.  Neenah therefore must add the entire amount of the STIP payment back into the regular rate for the calendar years during which the STIP payments were earned, and pay additional overtime pay owed to its Whiting Mill employees caused by the resulting increases to their weekly regular rates of pay, on both overtime pay the employees previously received and overtime pay that employees recover through this lawsuit.

67.     Alternatively, even if the STIP payments are true percentage bonuses that are covered by the safe harbor offered by §778.210, Neenah must pay additional overtime pay to Plaintiffs and other members of the proposed collective on all overtime pay that they are entitled to receive.  Therefore, if there is a recovery of overtime pay because Neenah failed to fully compensate its employees for work performed at the beginning of the shift, or because Wire Time and/or Call time Pay must be included in the regular rate, the employees are entitled to additional overtime damages computed as the overtime pay recovered through this lawsuit multiplied by the STIP percentage that Neenah used to compute the payout for the applicable year.

68.     Because Neenah had no reasonable grounds for believing that its timekeeping and employee compensation policies at issue in this lawsuit complied with the FLSA, Plaintiffs are entitled to liquidated damages on all additional overtime pay that they should have received under the FLSA.

69.     Because Neenah was fully aware of its obligation to pay its employees full overtime pay for their hours worked over 40 per week, yet failed to adequately investigate whether the FLSA permitted it to shave off time worked by shift workers before the scheduled

17

start times of their shifts through rounding, whether Wire Time and Call Time pay must be included in the regular rate, and whether the STIP payments qualify as percentage bonuses under §778.210, Plaintiffs are entitled to the application of a three-year statute of limitations for willful violations.

70.    Plaintiffs are additionally entitled to their reasonable attorneys' fees incurred in prosecuting this first cause of action.

### COUNT II. CLAIM FOR UNPAID WAGES UNDER WISCONSIN LAW.

71.    Plaintiffs re-allege, and incorporate by reference, the allegations contained in paragraphs 1 - 70 of the Complaint.

72.    Under Wisconsin law, employees must be paid for all time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business. The Wisconsin workday may be longer than the employee's scheduled shift because it generally means the period between the time on any particular workday at which such employee commences their principal activity or activities and the time on any particular workday at which they cease such principal activity or activities.

73.    Because the handover meetings are integral and indispensable to the relieving shift workers' performance of principal activities, the relieving shift workers' compensable workdays began when the handover meetings began rather than at the scheduled start times for their shifts.

74.    There are no Wisconsin statutes, regulations, or administrative guidance available to the public that, like 29 C.F.R. §785.48(b), authorize employers to round its

18

employees' starting and ending times, so that Neenah may not disregard through rounding its Whiting Mill shift workers' time worked before their scheduled start times.

75.    Even if Wisconsin law permits the rounding of start times, by requiring its Whiting Mill shift workers to punch in between 0 and 7 minutes before their scheduled start times, Neenah virtually eliminated instances when Whiting Mill shift workers received pay for minutes not worked, so that there are no overpayments to offset the many instances when Whiting Mill shift workers were not paid for 3-6 minutes worked before the scheduled start time sof their shifts. As a result, Neenah failed to fully compensate its Whiting Mill shift workers for all of their hours worked on and after January 1, 2024.

76.    Because Wisconsin law requires the payment of full straight time wages rather than just minimum wages, Plaintiffs and members of the proposed class are entitled to recover all additional straight time pay and overtime pay they would have received, had Neenah used the times when they began their change-over meetings rather than their scheduled start times as the times when their compensable workdays began.

77.    As defined by the Wisconsin Department of Workforce Development, the Wisconsin agency responsible for administering Wisconsin's overtime laws, the Wisconsin Regular rate includes all remunerations paid to or on behalf of the employee such as commissions, nondiscretionary bonuses, premium pay, and piecework incentives.

78.    Wire Time Pay is additional remuneration for employment paid to employees to compensate them for performing the hazardous and arduous work of changing paper machine wires.

79.    Call Time Pay is additional remuneration for employment paid to employees to compensate them for the twin inconveniences of working a schedule with an irregular start time;

19

and doing so with little advanced notice to allow them to make plans to avoid disruptions that the irregular start time has upon their lives.

80.     Wisconsin law therefore requires Neenah to include both Wire Time Pay and Call Time Pay, both of which are remuneration paid to Whiting Mill employees, in computing their regular rates of pay.

81.     Because Wisconsin follows the FLSA definition of non-discretionary bonuses, for the same reasons pled under the FLSA, the STIP payments that Neenah paid to its employees for 2023 and 2024 are non-discretionary bonuses that must be included in computing the Wisconsin regular rate.

82.     The STIP payments did not increase the employees' regular rates of pay and overtime pay by the same percentage for the exact time periods during which the STIP payments were earned. Because the STIP payments are not true percentage bonuses, the entire amounts of the STIP payments must be added back into the computation of the regular rate for the calendar year during which the STIP payments were earned, and the employees are entitled to additional overtime pay caused by the resulting increase in their weekly regular rates of pay.

83.     Even if the STIP payments were true percentage bonuses, Neenah must pay additional overtime pay computed by multiplying all overtime pay that employees recover through this lawsuit by the applicable STIP payment percentage.

84.     Because Neenah failed to pay to Plaintiffs all straight time and overtime wages required by Wisconsin law within 31 days of when the work was performed, Defendants violated Wis. Stat. §109.03(1), so that Plaintiffs may bring suit under Wis. Stat. 109.03(5) to recover all straight time and overtime wages owed to them, plus 50% of the unpaid wages as liquidated

20

damages allowed by Wis. Stat. §109.11(2), plus their reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to Wis. Stat. §109.03(6).

WHEREFORE, Plaintiffs respectfully request the Court to enter an order that:

a.    Finds that Neenah is liable to them for all overtime pay that they should have received had they received credit for all of their hours worked, and had it computed their overtime pay using the method permitted by the FLSA; plus 100% liquidated damages;

b.    Finds that Neenah is liable to them for all straight time pay and overtime pay they should have received under Wisconsin law, plus 50% liquidated damages;

c.    Award relief similar to prayer for relief subparagraph a to each collective member who is similarly situated to them;

d.    Award relief similarly to prayer for relief subparagraph b to each member of the proposed class;

e.    Award to them reasonable attorneys' fees and costs incurred in maintaining and prosecuting this action on an individual, collective, and class basis; and

f.    Awards to them such other and further relief as the Court deems just and proper.

Dated this 29th day of June, 2026.

/s/ Yingtao Ho
Yingtao Ho
Email: vh(&,previant.com
Attorney for Plaintiffs
The Previant Law Firm S.C.
310 W. Wisconsin Avenue, Suite 100MW
Milwaukee, WI 53203
Telephone: 414-271-4500
Fax: 414-271-6308

21

Consent to Opt In and
Participate as a Named Plaintiff in Suit for
Violations of Fair Labor Standards Act

I, Dstin, hereby consents to participate in the lawsuit against Neenah, Inc., Mativ, Inc., along with any subsidiaries, owners, or managing agents of one or more of these entities who may be responsible for the underpayment of wages to me for work performed at the Whiting Mill (Hereinafter "Employers") under the Fair Labor Standards Act, 29 U.S.C. §201 et seq. This written consent is intended to serve as my consent in writing to join in this lawsuit and become a party plaintiff as required by 29 U.S.C. § 216(b).

During the last two years, Employers failed to pay to me all overtime wages equal to a full 1.5 times my regular rate for all of my hours worked over 40 per week, so that I am consenting to join in a lawsuit for unpaid minimum wages, overtime wages, attorneys' fees and costs against Employers.

By signing and returning this consent to sue, I understand that I will be represented by The Previant Law Firm, s.c.

Dated: 6-10-2026

Signed: Dstin Kercrov

Consent to Opt In and
Participate as a Named Plaintiff in Suit for
Violations of Fair Labor Standards Act

I, _Steie_ , hereby consents to participate in the lawsuit against Neenah, Inc., Mativ, Inc., along with any subsidiaries, owners, or managing agents of one or more of these entities who may be responsible for the underpayment of wages to me for work performed at the Whiting Mill (Hereinafter "Employers") under the Fair Labor Standards Act, 29 U.S.C. §201 et seq. This written consent is intended to serve as my consent in writing to join in this lawsuit and become a party plaintiff as required by 29 U.S.C. § 216(b).

During the last two years, Employers failed to pay to me all overtime wages equal to a full 1.5 times my regular rate for all of my hours worked over 40 per week, so that I am consenting to join in a lawsuit for unpaid minimum wages, overtime wages, attorneys' fees and costs against Employers.

By signing and returning this consent to sue, I understand that I will be represented by The Previant Law Firm, s.c.

Dated: 6-10-2026

Signed: